Donald E. CULBERTSON, Plaintiff,

v.

UNITED STATES of America, and Federal Deposit Insurance Corporation, Defendants.

VALLEY VIEW STATE BANK, Plaintiff

v.

Donald E. CULBERTSON, Bernard D. Craig, Jr., and Mary Ann Craig, Defendants,

and

Donald E. CULBERTSON, Third–Party Plaintiff,

v.

UNITED STATES of America, and Federal Deposit Insurance Corporation, Third–Party Defendants.

Civil Action Nos. 96–2105–GTV, 96–2139–GTV.

United States District Court, D. Kansas.

April 30, 1997.

1498

Leonard B. Rose, Martha A. Halvordson, Rose, Brouillette & Shapiro, P.C., Kansas City, MO, for Donald E. Culbertson, Bernard D. Craig, Jr. and Mary Ann Craig.

Robert A. Olsen, Office of U.S. Attorney, Kansas City, KS, for USA in No. 96–2105–GTV.

Robert A. Olsen, Office of U.S. Attorney, Kansas City, KS, David C. Stout, Chionuma & Associates, P.C., Kansas City, MO, for Federal Deposit Ins. Corp. in No. 96–2105–GTV.

Douglas Lancaster, Overland Park, KS, for Valley View State Bank.

Robert A. Olsen, Office of U.S. Attorney, Kansas City, KS, Jackie N. Williams, Office of U.S. Attorney, Wichita, KS, for USA and Federal Deposit Ins. Corp. in No. 96–2139–GTV.

## MEMORANDUM AND ORDER

VAN BEBBER, Chief Judge.

This matter is before the court on the following:

(1) Motion for Summary Judgment (Doc. 78) by defendant/third-party defendant Federal Deposit Insurance Corporation—Receiver ("FDIC-receiver") on claims of plaintiff/third-party plaintiff Donald E. Culbertson ("Culbertson") pursuant to Fed.R.Civ.P. 56(a) & (b);

(2) Motion for Summary Judgment (Doc. 80) by Valley View State Bank ("Valley View") on claims against defendants Culbertson, Bernard Craig, and Mary Ann Craig pursuant to Fed.R.Civ.P. 56(a);

(3) Motion for Summary Judgment (Doc. 82) by Culbertson on his breach of contract claim against FDIC-receiver pursuant to Fed.R.Civ.P. 56(a);

(4) Motion for Summary Judgment (Doc. 84) by Culbertson on FDIC-receiver's counterclaims pursuant to Fed.R.Civ.P. 56(b); and

(5) Motion for Summary Judgment (Doc. 86) by defendants Culbertson, Bernard Craig, and Mary Ann Craig on claims of Valley View pursuant to Fed.R.Civ.P. 56(b).

The parties have fully briefed the issues in each of the above listed motions and the court is prepared to rule. For the reasons set forth below, the court rules as follows: (1) the FDIC-receiver's motion for summary judgment is granted in part and denied in part; (2) Valley View's motion for summary judgment is granted in part and denied in part; (3) Culbertson's motion for summary judgment on the breach of written contract claim against the FDIC-receiver is denied; (4) Culbertson's motion for summary judgment on the FDIC-receiver's counterclaim is denied; and (5) the summary judgment motion of Culbertson, Bernard Craig, and Mary Ann Craig is denied.

In the interest of brevity, the court adopts the procedural background of this case as set forth in its memorandum and order of February 25, 1997. Subsequent to the court's order, plaintiff/third-party plaintiff Culbertson filed an amended complaint and amended third-party complaint (collectively "amended complaints"). The amended complaints are identical, and contain claims for breach of oral contract, breach of written contract, and indemnification against defendant/third-party defendant FDIC-receiver.

For its counterclaim in each case, the FDIC-receiver alleges that Culbertson breached his guaranty agreement. Valley View has sued Bernard and Mary Ann Craig (collectively "the Craigs") and Culbertson for breach of their guaranty agreements.

The FDIC-receiver requests summary judgment on Culbertson's claims for breach of oral contract and indemnification[1] and on its counterclaim. Culbertson seeks summary judgment on his breach of written contract claim and on the FDIC-receiver's counterclaim. In cross-motions for summary judgment, Valley View and defendants Culbertson and the Craigs move for summary judgment on Valley View's breach of guaranty claim.

## I. SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judg-

---

1. In its memorandum and order of February 25, 1997, the court dismissed Culbertson's claim of tortious conversion against the FDIC. As the current motions were filed prior to the court's order, they address Culbertson's claim for conversion even though that claim is not contained in his amended complaints. Because that issue is moot, the court will not consider the parties' arguments for dismissal of Culbertson's tortious conversion claim. Additionally, Culbertson filed his claim for breach of written contract subsequent to the FDIC-receiver's motion for summary judgment. Thus, the court will consider the FDIC-receiver's current motion as a request for partial summary judgment.

ment as a matter of law." Fed.R.Civ.P. 56(c). The court must examine the factual record and reasonable inferences therefrom in a light most favorable to the party who opposes summary judgment. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990). The moving party has the initial burden of showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party meets this burden, the burden shifts to the nonmoving party to identify specific facts that show the existence of a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party's burden is to " 'present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.' " *Thomas v. International Business Machs.,* 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Indus., Inc.,* 939 F.2d at 891).

 The legal standard does not change if the parties have filed cross-motions for summary judgment. Each party has the burden of establishing the lack of a genuine issue of material fact and entitled to judgment as a matter of law. *Rains v. Cascade Indus., Inc.,* 402 F.2d 241, 245 (3d Cir.1968). The court will not automatically decide the case at the summary judgment stage merely because the parties have filed cross-motions for summary judgment. *Id.*

## II. FACTUAL BACKGROUND

The following facts, as established by the parties in accordance with D. Kan. Rule 56.1, are either uncontroverted or, if controverted, construed in the light most favorable to the non-moving party. *Applied Genetics,* 912 F.2d at 1241. Immaterial facts and facts not properly supported by the record are omitted.

Culbertson established Sunway Hotel Management, Inc. ("Sunway") in 1983 for the business purpose of purchasing and managing hotels. In late 1984 or early 1985, Culbertson formed a banking relationship with Metro North State Bank ("Metro North"). Metro North was declared insolvent in No-

vember 1992, and the FDIC was appointed receiver for the institution.

Culbertson formed six limited partnerships: Pompano Beach Associates, Ltd.; Ft. Lauderdale Oakland Park Associates, Ltd.; Ft. Lauderdale Broward Associates, Ltd.; Miami Civic Center Associates, Ltd.; Miami Airport Associates, Ltd.; and Ft. Lauderdale Surf Associates, Ltd. (collectively "the Florida limited partnerships"), for the purpose of purchasing six Florida hotels. In March 1985, the Florida limited partnerships executed and delivered a promissory note ("Florida note") to Metro North in which Metro North agreed to lend the Florida limited partnerships $9,000,000.00 ("Florida loan"). Sunway was the general partner for each of the Florida limited partnerships, and Culbertson, in his capacity as president of Sunway, signed the Florida note.

To secure the Florida loan, Culbertson also signed a mortgage and security agreement on behalf of the Florida limited partnerships. The Florida limited partnerships conveyed a mortgage in favor of Metro North in six individual tracts of property, each containing a hotel, located in Dade County and Broward County, Florida. Metro North further required Culbertson to execute and deliver his personal guaranty as security for the Florida note ("Florida guaranty"). Culbertson guaranteed unconditionally the obligations of the Florida limited partnerships under the Florida note.

Metro North and the Florida limited partnerships modified and extended the Florida note on several occasions. In 1986, Culbertson, on behalf of the Florida limited partnerships, decided to sell three of the Florida hotels. In July 1986, Metro North and the Florida limited partnerships entered into a modification and assumption agreement ("the 1986 modification") in order to facilitate the transfer of the partnership interest of Ft. Lauderdale Broward Associates, Ltd.; Miami Airport Associates, Ltd.; and Ft. Lauderdale Surf Associates, Ltd. ("assuming parties") to the Richard Roberts, Co. Under this modification, the assuming parties agreed to remain liable on a portion of the indebtedness due under the Florida note, plus additional

sums to be advanced. As security for this assumption, the assuming parties pledged a portion of the collateral that originally secured the Florida note. The indebtedness due under the 1986 modification was $5,505,000, and was payable in full by January 20, 1987.

Following execution of the 1986 modification, the following transfers occurred: Palm Tree Two Associates, Ltd. acquired the interests of Ft. Lauderdale Broward Associates, Ltd.; Palm Tree Three Associates, Ltd. ("Palm III") acquired the partnership interests in Miami Airport Associates, Ltd.; and Richard Roberts Income Hotel Associates, Ltd. ("Richard Roberts") acquired the partnership interests of Ft. Lauderdale Surf Associates, Ltd. Pursuant to the transfers, Palm III assumed control over the Miami Airport Days Inn ("Days Inn") and Richard Roberts acquired control of the Ft. Lauderdale Surf Hotel ("Surf Hotel").

As security, Richard Roberts executed and delivered to Culbertson a $10 million wrap promissory note[2] ("wrap note") and wrap mortgage.[3] Robert H. Haines III provided additional security for the wrap note by executing and delivering a limited personal guaranty to Culbertson. The wrap mortgage was on the Surf Hotel. That mortgage wrapped a first mortgage of $8,650,000 owned by American Savings Bank ("American Savings") and also was subordinate to the mortgage that Metro North held as security for the Florida loan.

In August 1987, Culbertson executed and delivered a collateral pledge agreement and assignment of promissory note and mortgage to Metro North in which he pledged the wrap note, the wrap mortgage, and a certificate of deposit as security for all of his debt at Metro North. Thereafter, Culbertson deliv-

ered the wrap note and wrap mortgage to Metro North.

Between January 1987 and July 1992, Metro North and the assuming parties amended and extended the 1986 modification sixteen times. On March 21, 1991, Palm III and Richard Roberts filed for bankruptcy protection. Sunway and Culbertson filed proofs of claim in the bankruptcies. Sunway filed a proof of claim for breach of a hotel management agreement, and Culbertson filed a proof of claim for the wrap note and wrap mortgage.

In January 1992, Metro North submitted a modified reorganization plan in the bankruptcy proceeding, which the bankruptcy court confirmed. Under the plan, Hotels International III, Inc. ("Hotels III") was to acquire the partnership interest of Palm III, and Hotels International IV, Inc. ("Hotels IV") was to acquire the partnership interests of Richard Roberts. Hotels IV assumed the debt on the Surf Hotel on a non-recourse basis.

The plan also provided that Metro North would lend $2,000,000 to Hotels IV. As security for that loan, Metro North received a super-priority lien on the Surf Hotel. This lien was superior to the American Savings mortgage, the Metro North Florida loan mortgage, and the Culbertson wrap mortgage. The plan further stipulated that the amount of Metro North's Florida loan lien was reduced to $4,250,000 and that Culbertson's wrap note lien was reduced to $2,000,000.

Metro North also advanced $200,000 to Palm III for confirmation of that portion of the reorganization plan. Metro North secured the loan by taking a third deed of trust on the Days Inn. On July 22, 1992, Hotels III purchased the Days Inn, and Hotels IV purchased the Surf Hotel.

---

**2.** According to one commentator,

[t]he wraparound mortgage is a financing device used when the property to be purchased is encumbered by a mortgage having a favorable rate of the interest. In order to take advantage of the favorable interest rate, the preexisting mortgage is left in place. The wrap outstanding on the preexisting mortgage, plus the additional funds advanced to the buyer. The buyer services the entire debt secured by the wrap mortgage; the wrap lender-mortgagee is obli-

gated (as between himself and the borrower) to service the first mortgage.

Jerry Bronner, *The Wraparound Mortgage: Its Structure, Uses, and Limitations,* 12 J. Real Est. Tax'n 315, 319 (1985).

**3.** The record is not clear on why the wrap note and wrap mortgage were executed and delivered to Culbertson in his individual capacity rather than to Sunway or to the assuming parties.

Metro North and the assuming parties amended the 1986 modification in July 1992 to reflect the terms of the bankruptcy reorganization plan. Specifically, Metro North and the assuming parties agreed that the remaining indebtedness due under the 1986 modification was $4,250,000. Culbertson, as guarantor of the 1986 modification, ratified and confirmed his liability on the $4,250,000 indebtedness.

Culbertson and the FDIC-receiver dispute the total amount of indebtedness that Culbertson remained liable for under his guaranty agreement. Culbertson asserts that the 1986 modification, as amended in July 1992, established the total remaining indebtedness due on the Florida loan—$4,250,000.00 plus interest. Therefore, as guarantor of the Florida loan, Culbertson contends that his potential liability is limited to that amount.

The FDIC-receiver argues that Culbertson's potential liability is $6,057,963.76, plus interest. The FDIC-receiver maintains that the 1986 modification to the Florida loan, as amended in July 1992, affected the loan balance for only three of the original six limited partnerships: Ft. Lauderdale Broward Associates, Ltd.; Miami Airport Associates, Ltd.; and Ft. Lauderdale Surf Associates, Ltd. Specifically, the FDIC-receiver contends that those partnerships, and Culbertson as guarantor, are liable for $4,250,000.00, plus interest. Additionally, the FDIC-receiver asserts that the other three original limited partnerships, Pompano Beach Associates, Ltd.; Ft. Lauderdale Oakland Park Associates, Ltd.; and Miami Civic Center Associates, Ltd. remained liable, along with Culbertson as guarantor, for the balance of the Florida loan that was unaffected by the 1986 modification, namely $1,807,963.76 plus interest.

The parties also dispute the value of Culbertson's wrap mortgage at the time the FDIC-receiver released the mortgage. Following approval of the bankruptcy reorganization plan, Hotels III and IV defaulted on the payments due under the plan. American Savings (the second lienholder) instituted foreclosure proceedings on the Surf Hotel. At the time of foreclosure, the liens superior to Culbertson's wrap mortgage on the Surf Hotel included: $1,429,716 for property tax-es; $2,355,263 for Metro North's super-priority lien; $11,010,384 for American Savings' lien; and $5,259,885 for Metro North's Florida loan lien. The parties agree that the appraised fair market value of the Surf Hotel in 1994 was $11,000,000. Additionally, there was $823,617 in a money market account that represented insurance proceeds paid to the Surf Hotel for damages sustained in Hurricane Hugo.

The FDIC-receivers for Metro North and American Savings entered settlement discussions with Hotels IV. The parties reached an agreement in which Metro North and American Savings would receive a payout of $6,524,814.42 from Hotels IV. The funds from the payout were distributed as follows: (1) full satisfaction of the Metro North super-priority lien, and (2) the remainder going towards the amount due on the American Savings lien. Additionally, Metro North received $550,000 of the insurance proceeds, with American Savings receiving the remainder. In exchange for those payouts, the FDIC-receivers, on December 22, 1994, released Metro North's super-priority lien, the American Savings' lien, Metro North's Florida loan lien, and Culbertson's wrap mortgage.

The FDIC-receiver contends that Culbertson's wrap mortgage was worthless because there were liens totalling over $21 million that were superior to his wrap mortgage on the Surf Hotel. Culbertson responds that his wrap mortgage was worth $2 million—the value of his lien established under the bankruptcy reorganization plan. Specifically, Culbertson argues that the FDIC-receivers agreed to settle their liens on the Surf Hotel for just over $7.2 million. Culbertson asserts that deducting the tax lien of just over $1.4 million and the $7.2 million for the FDIC-receivers' liens from the nearly $11 million sale price of the Surf Hotel would have left at least $2 million that could have satisfied his wrap mortgage.

In a separate business transaction from the Florida loan, Culbertson and Bernard Craig formed three limited partnerships, Austin Associates, Ltd.; Arlington Associates, Ltd.; and Corpus Christi Associates, Ltd. (collectively "the Texas limited partner-

ships"), to purchase three hotels in Texas. The Texas limited partnerships sought Metro North's assistance in financing the transaction in May 1985. Bernard Craig, an attorney who provided Culbertson with legal services and who was general partner for the Texas limited partnerships, executed and delivered to Metro North a promissory note for $3,245,000, and Metro North loaned that amount ("Texas loan") to the partnerships. Culbertson, Bernard Craig, and Mary Ann Craig each executed and delivered to Metro North their· unconditional guarantees for the Texas loan. As part of Culbertson's 1987 collateral pledge agreement and his assignment agreement, Culbertson pledged the wrap note and wrap mortgage to secure all of his indebtedness to Metro North, including both the Texas and Florida loans.

In April 1994, Valley View State Bank ("Valley View") held a 67.8 percent ownership interest in the Texas loan while the FDIC owned only .8 percent of the loan. Because of its small percentage of ownership in the Texas loan, the FDIC-receiver assigned the loan to Valley View in May 1994.

### III. DISCUSSION

As the court noted previously, the parties have filed numerous summary judgment motions on the claims arising out of the Florida and Texas loan transactions. The court will address the parties' motions in turn.

### A. Motion for Summary Judgment by the FDIC-receiver

The FDIC-receiver advances two alternative grounds to support judgment on Culbertson's claim for breach of oral contract: (1) his claim is barred under 12 U.S.C. § 1823(e); or (2) his claim is barred by the Missouri Statute of Frauds, Mo.Rev.Stat. § 432.010. The FDIC-receiver next argues that Culbertson's indemnification claim must fail because he has not established the requisite elements to prove a claim of implied indemnification. The court will address each claim separately.

**4.** This doctrine arises under *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and provides

### 1. Breach of oral contract

■ Culbertson claims that prior to the FDIC-receiver's takeover of Metro North, he reached an oral agreement with a representative of the bank for the release of Culbertson and the Craigs from liability under their personal guaranties for the Florida and Texas loans. Culbertson claims that he agreed to waive his claim for Sunway's management fees in the Roberts' bankruptcy and to convey his interest in the wrap note and wrap mortgage to Metro North in exchange for the release from liability. Culbertson and Metro North did not reduce the alleged agreement to writing. Culbertson maintains that the FDIC-receiver's attempt to recover on the Florida loan guaranty is a breach of the oral contract.

The FDIC-receiver first argues that Culbertson's breach of oral contract claim must fail because 12 U.S.C. § 1823(e) bars the claim. Section 1823(e) of FIRREA is a partial codification of the *D'Oench, Duhme* doctrine,[4] and provides in pertinent part:

No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 182 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement—

(1) is in writing;

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution;

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee; and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

essentially that a party is estopped from asserting a "secret agreement" in defense to collection efforts of the FDIC.

The FDIC-receiver contends that the alleged oral agreement does not meet any of the four requirements under § 1823(e).

It is uncontroverted that: (1) the agreement between Culbertson and Metro North for a release of Culbertson's personal guaranty was not in writing; (2) that the alleged agreement was not executed contemporaneously with Metro North's acquisition of Culbertson's personal guaranty or the pledge of the wrap note and wrap mortgage; (3) the Metro North board of directors did not approve the agreement; and (4) the agreement has not been, since its execution, an official record of Metro North. On its face, it would appear that the FDIC-receiver is entitled to summary judgment on this issue.

To sidestep application of § 1823(e), Culbertson argues that he is not suing the FDIC-receiver on the original oral contract between himself and Metro North. Instead, Culbertson contends that the FDIC-receiver ratified the original oral contract subsequent to its takeover of Metro North, and, thereafter, a new contract existed between Culbertson and the FDIC-receiver. Culbertson asserts that his claim is based on this new contract and that § 1823(e) does not preclude the claim.

Culbertson relies on *Slappey Builders, Inc. v. Federal Deposit Ins. Corp.*, 157 Ga. App. 343, 277 S.E.2d 328 (1981) to support his inventive argument. In *Slappey*, the plaintiff contended that it entered into an oral agreement with the FDIC to accept the proceeds from the sale of certain property in full satisfaction of the outstanding balance of a construction loan held by the failed institution. *Id.* 277 S.E.2d at 331. The state trial court granted the FDIC summary judgment on the plaintiff's claim for breach of contract, ruling that § 1823(e) estopped the plaintiff from enforcing the oral agreement. On appeal, plaintiff argued that § 1823(e) applied only to agreements between the debtor and the insolvent institution, and, thus, did not bar direct agreements between the debtor and the FDIC. In reversing the trial court, the Georgia Court of Appeals held that § 1823(e)'s proscription against secret side agreements did not apply "to direct agreements between ... debtors and the FDIC

after having purchased the assets of a failed bank." *Id.*

Culbertson maintains that *Slappey* is on point with the facts in this case. Culbertson claims that his attorney sent the FDIC-receiver a letter outlining the terms of Culbertson's oral agreement with Metro North. Specifically, Culbertson contends that, pursuant to the oral agreement, he tendered two checks to the FDIC-receiver. Culbertson received those checks as partial payments on Sunway's claims in the Roberts bankruptcy. Finally, Culbertson asserts that the FDIC-receiver's subsequent action in releasing the wrap mortgage proves that the FDIC-receiver ratified and accepted the oral agreement.

■ The court is not persuaded by Culbertson's contentions. *Slappey* is distinguishable from this case on its facts. *Slappey* involved an entirely new agreement made post-takeover of a bank by the FDIC. The court agrees that an entirely new agreement, even an oral agreement, made between the FDIC and a debtor post-takeover is enforceable. *See Federal Deposit Ins. Corp. v. Hulsey*, 22 F.3d 1472, 1482 (10th Cir.1994) (genuine issues of material fact precluded summary judgment on issue of alleged oral settlement agreement entered into post-takeover between FDIC and the defendant). However, the court's research has not found a single federal court case or another state court decision that has interpreted § 1823(e) in a situation where the FDIC allegedly ratified an oral agreement entered into prior to the FDIC's takeover.

■ As the court noted above, the alleged agreement between Culbertson and Metro North does not meet all of the requirements of § 1823(e). The alleged agreement between Culbertson and the FDIC-receiver (ratification of the Metro North agreement) also does not meet the requirements of that section. Additionally, not permitting Culbertson to disguise his alleged oral agreement with Metro North as post-takeover ratification is in accordance with the stated purpose of § 1823(e). As the United States Supreme Court observed in *Langley v. Federal Deposit Ins. Corp.*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340

(1987), the purpose of § 1823(e) is to allow the receiver to make an informed determination regarding the insolvent institutions assets and to move quickly in preserving the value of the institution. *Id.* at 91, 108 S.Ct. at 401. Accordingly, the court holds that the FDIC-receiver is entitled to summary judgment on Culbertson's breach of oral contract claim.

■■■ Notwithstanding the estoppel of § 1823(e), the Missouri Statute of Frauds also prohibits enforcement of the alleged oral agreement. The Missouri Statute of Frauds[5] provides that:

> No action shall be brought to charge any executor or administrator, upon any special promise to answer for any debt or damages out of his own estate, or to charge any person upon any special promise to answer for the debt, default or miscarriage of another person, or to charge any person upon any agreement made in consideration of marriage, or upon any contract made for the sale of lands, tenements, hereditaments, or an interest in or concerning them, or any lease thereof, for a longer time than one year, or upon any agreement that is not to be performed within one year from the making thereof, unless the agreement upon which the action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith....

Mo.Rev.Stat. § 432.010 (1996). Here, Culbertson assumed responsibility for the debt of the Florida and Texas limited partnerships. The result is that the statute of frauds requires his personal guaranty to be in writing. Additionally, Missouri law requires that "[i]f a contract is subject to the statute of frauds, any modification of that contract must also be in writing." *Holt v. Story,* 642 S.W.2d 394, 396 (Mo.Ct.App.1982) (citing *Gee v. Nieberg,* 501 S.W.2d 542, 544 (Mo.Ct.App.1973), and *Miller v. Arnold,* 51 S.W.2d 124, 125 (Mo.Ct.App.1932)). Conse-

quently, the statute of frauds bars enforcement of the oral modification agreement that Culbertson advances in support of his breach of oral contract claim.

Culbertson responds that the oral agreement was a compromise settlement agreement with the FDIC-receiver and that the agreement does not need to be in writing because the subject matter of the compromise is not within the statute of frauds. Culbertson relies on *Sappington v. Miller,* 821 S.W.2d 901 (Mo.Ct.App.1992), where the Missouri Court of Appeals held that an oral compromise agreement must be in writing only if the statute of frauds controls the subject matter of the compromise. *Id.* at 903. Culbertson proceeds to make sweeping conclusions, without support, that the compromise agreement "does not fall within the scope of the statute . . . [and] the arguments made by the FDIC-receiver are inapplicable."

■ Culbertson's conclusory statements aside, his reliance on *Sappington* misses the mark. The *Sappington* court noted that it is "the intended effect of the compromise, and not . . . the question of whether the parties' antecedent claims are based on matters governed by the Statute of Frauds" that controls whether the agreement must be in writing. *Id.* at 903. Here, the claimed intended effect of the alleged compromise agreement was to release Culbertson from his personal guaranty on the Florida and Texas loans in exchange for the conveyance of the wrap note and wrap mortgage. Both the personal guaranty and the conveyance of the wrap note and wrap mortgage are contracts that the statute of frauds requires to be in writing. Thus, the modification proposed by the compromise settlement agreement also must be in writing to satisfy the statute of frauds. The court concludes that the Missouri statute of frauds bars enforcement of the oral compromise agreement against the FDIC-receiver.

---

**5.** The parties agree that Missouri law applies to the Culbertson's contract claims. The Florida loan, Culbertson's guaranty, and Culbertson's collateral pledge agreement all contain a choice of law clause providing that Missouri law con-

trols the construction of the agreements. Under Kansas choice of law principles, the court concludes that Missouri law applies to the construction of the contracts.

## 2. Indemnification

■ The FDIC-receiver next seeks summary judgment on Culbertson's claim for indemnification. Culbertson claims that the FDIC-receiver must indemnify him for any amounts that he is found to owe Valley View on the Texas loan under his personal guaranty. The FDIC-receiver maintains that, under Kansas law,[6] Culbertson has not established a claim for implied indemnity.

In *Haysville U.S.D. No. 261 v. GAF Corp.*, 233 Kan. 635, 666 P.2d 192 (1983), the Kansas Supreme Court set forth the law regarding claims of indemnity as follows:

> There are two traditional situations in which claims of indemnity are allowed. The first occurs where there is an expressed contract of indemnity, such as a "hold harmless" agreement. The second occurs where a contract of indemnity may be implied when one is compelled to pay what another party ought to pay. The implied or constructive liability usually arises when one personally, without fault, is made to pay for a tortious act of another. The person paying has a right of action against the person at fault.

*Id.* at 642, 666 P.2d 192. Lacking an express agreement for indemnification, Culbertson must proceed under the theory of implied indemnification.

Culbertson argues that the FDIC-receiver is liable to him for any amount he is found owing on the Texas loan. Specifically, Culbertson contends that he could have used his wrap note and wrap mortgage to satisfy the Texas loan but for the FDIC-receiver's improper disposition of those instruments. Culbertson relies on the axiom set forth in *Denny's Inc., v. Avesta Enterprises, Ltd.*, 884 S.W.2d 281 (Mo.Ct.App.1994), in which the Missouri Court of Appeals noted that:

> [t]he right to implied indemnity depends upon the principle that everyone is responsible for the consequences of his own

wrong, and if others have been compelled to pay damages which ought to have been paid by the wrongdoer they may recover from him.

*Id.* at 290–291.

Culbertson's reliance on Avesta is misplaced. The court initially notes that *Avesta* is non-dispositive of Culbertson's indemnification claim because it is a Missouri court case that applied Missouri law. Additionally, Culbertson fails to satisfy the basic tenet of implied indemnity under Kansas law; that he is being required to pay for the tortious act of the FDIC-receiver. *See Haysville*, 233 Kan. at 642, 666 P.2d 192. Indeed, by its order of February 25, 1997, the court held that Culbertson did not have a claim for tortious conversion against the FDIC-receiver. Lacking a tortious act by the FDIC-receiver, Culbertson has not set forth a claim for implied indemnification, and the FDIC-receiver is entitled to summary judgment on this issue.

## 3. FDIC-receiver's counterclaim against Culbertson

Finally, the FDIC-receiver argues for summary judgment on its counterclaim against Culbertson, where it seeks payment under Culbertson's personal guaranty for the debt remaining on the Florida loan. The FDIC-receiver asserts that Culbertson owes $7,944,373.85 plus interest and attorneys' fees on the Florida loan. That amount consists of the deficiencies on the amount due under the 1986 modification of a portion of the Florida loan following the sale of the Surf Hotel and the Days Inn, and the remaining portion of the Florida loan not included in the 1986 modification.

In his response, Culbertson argues that a genuine issue of material fact exists concerning the amount due and owing on the Florida loan. Culbertson contends that the total

---

6. The parties agree that Kansas law should apply to Culbertson's indemnification claim. As the court noted previously, Kansas choice of law rules apply to this action. Under Kansas law, a claim for implied indemnification is a tort action, *see Nature's Share, Inc. v. Kutter Products, Inc.*, 752 F.Supp. 371, 387 (D.Kan.1990) (applying Kansas law), and, therefore, the situs of the inju-

ry determines which state's substantive law applies. *See Ling v. Jan's Liquors*, 237 Kan. 629, 634, 703 P.2d 731 (1985). In this action, Culbertson's domicile is Kansas. Consequently, Kansas substantive law applies because any injury he sustained due to the FDIC-receiver's failure to pay or discharge the Texas loan occurred in Kansas.

amount of indebtedness remaining on the Florida loan following the 1992 amendment to the 1986 modification was $4,250,000.

Notwithstanding his disagreement with the outstanding balance on the Florida loan, Culbertson also asserts that he is no longer liable on the Florida loan regardless of the amount owing. Culbertson maintains that Missouri law precludes the FDIC-receiver from recovering on Culbertson's personal guaranty. Pursuant to the collateral pledge agreement, Culbertson secured his guaranty by pledging the wrap note and wrap mortgage on the Surf Hotel. The FDIC-receiver released the wrap mortgage as part of the sale of the Surf Hotel to Hotels IV. Culbertson asserts that he did not receive notice from the FDIC-receiver concerning the sale of the collateral. In advancing Missouri's "absolute bar rule," Culbertson contends that he is not liable for any deficiency amount remaining on the Florida loan because of the FDIC-receiver's failure to provide him with the required notice prior to the sale of the collateral.

■ Missouri's Uniform Commercial Code sets forth the prerequisites for disposing of a debtor's collateral. Mo.Rev.Stat. § 400.9–504(3) (1996) provides the procedure for disposal of collateral after default:

> Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor.

Under this section, a guarantor is a debtor and is entitled to notice. *See McKesson Corp. v. Colman's Grant Village, Inc.,* 938 S.W.2d 631, 633 (Mo.Ct.App.1997); *Lendal*

*Leasing v. Farmer's Wayside Stores, Inc.,* 720 S.W.2d 376, 379 (Mo.Ct.App.1986).

■ Missouri law requires that a secured party comply strictly with the requirements for a commercially reasonable sale in section 400.9–504(3), including the notice requirements, before it can obtain a deficiency judgment after selling the collateral. *McKesson,* 938 S.W.2d at 633 (citing *Chrysler Capital Corp. v. Cotlar,* 762 S.W.2d 859, 861 (Mo.Ct. App.1989)). If the FDIC-receiver failed to give Culbertson reasonable notice of the sale of his collateral, it is precluded from acquiring a deficiency judgment. *Id.* This is known as the no-notice, no-deficiency absolute bar rule. *Id.*

The FDIC-receiver argues against application of the absolute bar rule. It contends that a split exists between the districts of the Missouri Court of Appeals on whether the absolute bar rule or the rebuttable presumption rule applies to deficiency judgments sought following the failure of the secured party to observe the section 400.9–504(3) notice requirements. Under the rebuttable presumption rule, a presumption exists that the collateral is worth at least the amount of the debt, and the burden shifts to the creditor to prove "the amount that should reasonably have been obtained through a sale conducted according to law." *Commercial Credit Equip. Corp. v. Parsons,* 820 S.W.2d 315, 324 (Mo.Ct.App.1991). The FDIC-receiver asserts that since the Missouri Supreme Court has not resolved the conflict between the dual strain of cases in the court of appeals, the court should predict how the state supreme court would rule on this issue.

The weakness in the FDIC-receiver's argument is that there is no conflict between the districts of the Missouri Court of Appeals; they all have adopted uniformly the absolute bar rule. *See McKesson,* 938 S.W.2d at 633, n. 1 (citations omitted) (analyzing the cases, both state and federal, that have applied the absolute bar rule as Missouri law). Only one court of appeals decision has held that the rebuttable presumption rule applies to a party's attempt to secure a deficiency judgment following a no-notice sale of collateral. *See Wirth v. Heavey,* 508 S.W.2d 263 (Mo.Ct.App.1974).

However, in the seminal Missouri case that adopted the absolute bar rule, *Gateway Aviation, Inc. v. Cessna Aircraft Co.*, 577 S.W.2d 860 (Mo.Ct.App.1978), the court refused to follow *Wirth* because it did not involve the lack of notice for a private sale.

Since *Gateway,* only one Missouri case has questioned the continued viability of the absolute bar rule. In dicta, the court in *Commercial Credit* advocated for the adoption of the rebuttable presumption rule in Missouri. 820 S.W.2d at 324. Neither *Wirth* or *Commercial Credit* are authority for applying the rebuttable presumption rule in the instant action. The court concludes that the Missouri Supreme Court would follow the long line of cases from the state's courts of appeals and adopt the absolute bar rule for deficiency judgments if the secured party fails to notify the debtor of the sale of his or her collateral.

 Resolution of this issue, however, does not end the court's inquiry. The absolute bar rule on a deficiency judgment only applies if the secured party failed to conduct a commercially reasonable sale, one element of which is the notice requirement. A genuine issue of material fact remains on whether the FDIC-receiver's sale of Culbertson's collateral was commercially reasonable. Specifically, the parties dispute whether Culbertson had "reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made...." Mo.Rev.Stat. § 400.9–504(3). The parties further dispute the value of Culbertson's collateral at the time of sale. The FDIC-receiver maintains that the collateral was worthless, while Culbertson asserts that it was worth at least $2,000,000. Consequently, the court holds that the FDIC-receiver is not entitled to summary judgment on this issue.

### B. Motion for Summary Judgment by Culbertson on his breach of written contract claim against FDIC-receiver

 Culbertson moves the court for summary judgment on his claim that the FDIC-receiver breached Culbertson's collateral pledge agreement by disposing of his collateral without notification.[7] In arguing against summary judgment, the FDIC-receiver maintains that Culbertson has failed to proffer any uncontroverted facts that relate to the damages Culbertson suffered due to the FDIC-receiver's alleged breach of the agreement.

 To state a claim for breach of contract under Missouri law, Culbertson must prove that: (1) an enforceable contract existed; (2) the terms of the contract provided for mutual obligations; (3) the FDIC-receiver failed to perform its obligations; and (4) he sustained damages as a result of the breach. *See Rice v. West End Motors, Co.*, 905 S.W.2d 541, 542 (Mo.Ct.App.1995); *Gilomen v. Southwest Mo. Truck Ctr.*, 737 S.W.2d 499, 500–01 (Mo.Ct.App.1987). The mere breach of a contract will not support recovery; Culbertson must prove the essential element of damages to succeed on his claim. *Gilomen,* 737 S.W.2d at 501.

In the current motion, Culbertson has not offered any facts relating to the element of damages. Summary judgment is inappropriate on this issue.

### C. Motion for Summary Judgment by Culbertson on FDIC-receiver's counterclaim

Culbertson seeks summary judgment on the FDIC-receiver's counterclaim for payment of the Florida loan under his personal guaranty. Culbertson asserts that Missouri's absolute bar rule precludes the claim. As noted above, genuine issues of material fact remain concerning the FDIC-receiver's counterclaim. For all the reasons stated, Culbertson is not entitled to summary judgment on this claim.

### D. Motion for Summary Judgment by Valley View and Motion for Summary Judgment by Culbertson and the Craigs

In cross-motions for summary judgment, Valley View and defendants, Culbertson,

---

7. The court notes that Culbertson seeks summary judgment on Count I of both his complaint and third-party complaint. In his amended complaint and amended third-party complaint, Count II contains Culbertson's claim for breach of the collateral pledge agreement.

Bernard Craig, and Mary Ann Craig, each seek summary judgment on Valley View's claim for payment under the respective defendants' personal guaranties for the outstanding amount due on the Texas loan.

As security for the loan, Culbertson, Bernard Craig, and Mary Ann Craig each executed an unconditional guaranty in favor of Metro North. Under the terms of the unconditional guaranty, each of guarantors, jointly and severally, guaranteed the Texas loan. In May 1994, the FDIC-receiver assigned the Texas loan and the unconditional personal guaranties to Valley View.

It is uncontroverted that Valley View has established its *prima facie* case to recover on the contracts of guaranty. Under Missouri law, Valley View must prove that: (1) Culbertson and the Craigs executed the guaranties; (2) they unconditionally delivered their guaranties to Metro North; (3) Metro North extended credit to the Texas limited partnerships in reliance on the guaranties; and (4) there is an amount due and owing on the Texas loan that is covered by the terms of the guaranties. *See ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 382 (Mo.1993)(en banc).

Culbertson and the Craigs advance only one ground in support of their motion for summary judgment. They contend that, under Missouri's absolute bar rule, the FDIC-receiver's failure to provide them notice of the disposition of the collateral securing Culbertson's personal guaranty estops Valley View from collecting on each of their guaranties for the deficiency amount owing. In its motion, Valley View addresses that contention and the other affirmative defenses that Culbertson and the Craigs have asserted. In their response to Valley View's motion, Culbertson and the Craigs argue that the absolute bar rule and the alleged oral agreement between Craig and the FDIC-receiver precludes summary judgment.

As previously noted, Missouri's absolute bar rule applies to the disposition of Culbertson's collateral. The court also found that facts in issue concerning the commercial reasonableness of the sale precluded summary judgment. For the reasons set forth above,

the court concludes that neither Culbertson nor Valley View are entitled to summary judgment on this issue.

■ The court's ruling, however, does not apply to the Craigs. Although they concede that the FDIC-receiver disposed of collateral that Culbertson owned, the Craigs assert that they were entitled to notice of the disposition prior to the sale. The court rejects the attempt to expand Missouri's absolute bar rule.

Under the Missouri Uniform Commercial Code, the term "debtor" is defined as:

the person who owes payment or other performance of the obligation secured, whether or not he owns or has rights in the collateral, and includes the seller of accounts or chattel paper. Where the debtor and the owner of the collateral are not the same person, the term "debtor" means the owner of the collateral in any provision of the article dealing with the collateral, the obligor in any provision dealing with the obligation, and may include both where the context so requires. . . .

Mo.Rev.Stat. § 400.9–105(1)(d) (1996). A guarantor is a debtor. *See McKesson*, 938 S.W.2d at 633; *Lendal Leasing*, 720 S.W.2d at 379. However, the Craigs take the definition one step further by arguing that all of the guarantors became liable on the Texas loan following the makers' default, and, therefore, each of the guarantors became the debtor. This argument ignores the import of the second sentence of § 400.9–105(1)(d). Because the Craigs were not the owners of the wrap mortgage, the debtor was Culbertson, the owner of the collateral. The wrap note and wrap mortgage secured only Culbertson's contract of guaranty for all of his indebtedness with Metro North, and were not the craigs' collateral. Because they were not owners of the collateral, the Craigs were not "debtors" under § 400.9–105(1)(d) who were entitled to use the absolute bar brought into play by § 400.9–504(3). The court concludes that the Craigs are not entitled to summary judgment on this ground.

The Craigs next argue that the alleged oral contract between Culbertson and Metro North, and subsequently ratified by the

FDIC-receiver, released them from their liability on the Texas loan. The court has previously addressed and rejected this argument based on the application of 12 U.S.C. § 1823(e). The Craigs apparently concede that they have no other affirmative defenses to Valley View's claim because they do not respond to any of Valley View's arguments on those defenses, except as noted above. Therefore, for the reasons Valley View sets forth, the court grants summary judgment on Valley View's claim against the Craigs.

IT IS, THEREFORE, BY THE COURT ORDERED that the FDIC-receiver's motion (Doc. 78) is granted in part and denied in part. The court dismisses Culbertson's claims for breach of oral contract and indemnification.

IT IS FURTHER ORDERED that Culbertson's motion (Doc. 82) for summary judgment on his breach of written contract claim against the FDIC-receiver is denied.

IT IS FURTHER ORDERED that Culbertson's motion (Doc. 84) for summary judgment on the FDIC-receiver's counterclaim is denied.

IT IS FURTHER ORDERED that Valley View's motion (Doc. 80) for summary judgment is granted in part and denied in part as explained herein. Specifically, the court grants summary judgment on Valley View's claim against Bernard Craig and Mary Ann Craig. The amount and nature of the Craigs' liability to Valley View remains for future determination.

IT IS FURTHER ORDERED that the motion of Culbertson and the Craigs for summary judgment (Doc. 86) against Valley View is denied.

Copies of this order shall be mailed to counsel of record for the parties.

IT IS SO ORDERED.